# EXHIBIT 1

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

CASE NO.:

XL FUNDING, INC.,

      Plaintiff,

v.

JOHN J. GRIGGS III, an individual,
and CROSS K. MOCERI, an individual,

      Defendants.

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF UNDER THE FLORIDA RACKETEERING AND INFLUENCE CORRUPTION ACT

Plaintiff, XL Funding, Inc. ("XL"), by and through undersigned counsel hereby files this Complaint for Damages and Injunctive Relief against Defendants, John J. Griggs III ("Griggs") and Cross K. Moceri ("Moceri"), and alleges as follows:

## GRIGGS AND MOCERI'S SCHEME AND PREDICATE ACTS- IN SHORT

1.      Defendants, John J. Griggs III and Cross K. Moceri are unscrupulous fraudsters who lack honor and are the princes of bait-and-switch tactics. Jointly, through their enterprise Presidium Group, LLC, they induced Plaintiff to invest in a real estate development project that consisted of three established and very profitable student housing properties plus a shopping mall with future plans to build multifamily, office and retail space on the site.

2.      Defendants, however, had no intention of moving forward with that project as represented to Plaintiff. The project that Defendants intended to pursue was a large mixed use complex with XL's money but not with XL's participation and the scheme was in two parts: First,

WALDMAN BARNETT
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

{00352168.DOCX }

to draw XL in and get its money with promises of significant returns and the ability for XL to increase its equity participatory interest, while securing for itself the role of manager under the to-be-executed Agreements. Second, to disappear Plaintiff with bogus bait and switch purposed capital calls, while making illusory the promised right of XL to increase its equity interest. This fraudulent inducement was the initial predicate act under the Florida RICO Act.

3.      Defendants' scheme to get rid of Plaintiff, post its investment, in what was known as Project Catalyst, in which fraudster Moceri's wife Susan is also a controlling member, was to:

a. turn the very profitable student housing properties into a significant money losing operation in an amazingly short period of time;

b. announce and move forward with Defendants' hidden but intended housing complex;

c. levy significant capital calls requiring Plaintiff to invest additional large sums of money in a project that was not what Defendants represented it to be, that on paper now looked like a bad investment perhaps not worth continuing to throw money at, while failing to provide XL relevant information regarding the project despite numerous requests;

d. wrongfully frustrate XL's option to increase its interest in the complex; and,

e. begin to dilute Plaintiff's ownership interest until either none remains or Plaintiff agrees to sell to Defendants at a ridiculously low price.

4.      In fact, in an email dated July 28, 2020 and written by Moceri, the truth that was the plan from day one was finally unveiled. Griggs and Moceri told XL that with respect to Project Catalyst there would be "significant upcoming capital calls initiated. So rather than face dilution, it should be preferable for Fischer to sell his interests now." In other words, you cannot win, we

will capital call you to death and either try to keep up-- good luck--or surrender and sell out to us now for far less than you paid!

5. Similarly, in a letter dated October 26, 2020, from Griggs and Moceri's counsel, the calculated and purposeful disregard of the critical inducement to provide XL the opportunity to increase its interest as promised as provided in the governing documents was further laid bare as such opportunity was admittedly unilaterally "modified" by Griggs and Moceri so XL would not be able to realize this right (short of litigation).

6. The acts committed by Defendants in furtherance of their scheme to get rid of Plaintiff are also predicate acts under the Florida RICO Act, all of which occurred within the last 3.5 years.

7. The Florida RICO predicate acts constitute a pattern of racketeering that was a part of an integrated scheme committed against Plaintiff to frequently get its money and then eliminate its ownership interest in its investment, so that there was a similar intent, results, victim, and thus were not isolated incidents.

8. But, this scheme which is at the core of this RICO claim, was only one of a series of inducements, lies and mistruths directed by Griggs and Moceri against the ultimate beneficial owner of Plaintiff.  These additional acts, subsequent to XL's investment, (which among others include Westpark and Pleasant Valley) were to further and facilitate the intended outcome of their Florida RICO Act scheme, causing XL to reach a level of distrust, frustration, dissatisfaction and concern that XL walks from this investment at a pittance of its actual value. [1] Certain of these other acts are set forth below in Paragraphs 70-81 herein.  Plaintiff expects these separate acts will serve

---

[1] Upon information and belief Griggs and Moceri through the use of their Presidium enterprise also victimized other investors with a scheme similar to the one alleged in this Complaint.

as further and separate bases for additional RICO claims and the treble damages that are associated with such bad acts once discovery uncovers further details. It is expected that the 20 subpoenas duces tecum for documents without deposition that accompany this filing, to be served after the 10 day waiting period, once complied with will provide sufficient additional evidence to add additional RICO violations.

## THE ENTERPRISE

9.      The Florida RICO enterprise is a company named Presidium Group, LLC, which Defendants co-founded, co-owned and serves as its co-chief executive officers.  Presidium holds itself out in writing as the sponsor of the real estate development project, the fraudulent investment that Defendants sold to Plaintiff.

10.      On its website, Presidium describes itself as a real estate developer, owner, operator with a spectrum of disciplines including acquisitions, development, property management, asset management, law, finance, accounting, special servicing, and public-private partnerships.

11.      With the depth of talent and experience that Presidium says that it has, a historically successful and highly profitable student housing complex does not evaporate into a money losing mess within less than 2 years unless this was intentional on the part of Griggs and Moceri.

## PARTIES, JURISDICTION AND VENUE

12.      This is an action under the Florida Racketeering and Influence Corruption Act (Chapter 895, Florida Statutes) (the "Florida RICO Act") Act for over $20 million dollars in damages to be trebled, exclusive of attorneys' fees and costs, which is within the jurisdictional limits of this Court, as well as for injunctive relief which is within the equitable jurisdiction of this Court.

WALDMAN BARNETT
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

{00352168.DOCX }

13.    Plaintiff, XL Funding, Inc., is a Delaware corporation authorized to do business in the State of Florida.  XL's principal place of business is located in Miami, FL.

14.    Defendant, John J. Griggs III, is an individual over the age of 18, who resides in Dallas, Texas, has significant contacts within the State of Florida (as hereinafter alleged) and is otherwise *sui juris*.

15.    Defendant, Cross K Moceri, is an individual over the age of 18, who resides in Austin, Texas, has significant contacts within the State of Florida (as hereinafter alleged) and is otherwise *sui juris*.

16.    Venue is proper in Miami-Dade County because, among other things, the initial unlawful predicate act committed by Griggs and Moceri giving rise to liability in this action took place in Miami-Dade County, Florida and the damages incurred were, and continue to be, suffered in Miami-Dade County.

17.    Both Griggs and Moceri have met in person with XL's principal in Miami-Dade County, FL with respect to Project Catalyst which is the subject of this action where inducements and representations were made to further their scheme and plan.

18.    Presidium maintains an office in the State of Florida located at 228 Canal Blvd., Unit 4, Ponte Vedra Beach, FL 32082.

19.    Finally, at least since 2017, Presidium has engaged in developing and building significant real estate projects in the Jacksonville, FL area and each of Griggs and Moceri have made personal appearances in Florida in connection therewith.

## FRAUDULENT INDUCEMENT – PART ONE OF THE RICO SCHEME

20.     Griggs and Moceri first made XL's owner aware of the viability of Project Catalyst by email dated January 20, 2017, when they notified XL that Presidium was awarded Project Catalyst and needed XL's financial help to make this deal happen.

21.     Then and subsequent to this e-mail, Griggs and Moceri represented on countless calls to XL's principal, who was in Miami, that they had extensive experience in the Austin student housing market and this was a great opportunity to leverage their experience and capitalize on their current student housing portfolio in Austin.

22.     Later, on March 1, 2017, Moceri once again expressed gratitude for the financial backing for him and Griggs which they disingenuously said "means a lot to us."

23.     These feigned sentiments were consistent with the plaudits heaped over time as this was not the first time that Griggs and Moceri needed money from the ultimate beneficial owner of XL.  To the contrary, other entities of the ultimate beneficial owner of XL had loaned Griggs and Moceri over $10 million so that Griggs and Moceri could keep their Presidium enterprise afloat.

24.     On October 16, 2017, Griggs and Moceri presented XL with a written presentation for (a)r the acquisition of 3 adjacent student housing residential apartment rental complexes and retail shopping mall located in Austin, TX for a total acquisition exceeding $100M and (b)  the future mixed-use development of offices / retail and residential on the properties.  Griggs and Moceri called that written presentation "our investment book."  This acquisition opportunity and development project was named by Defendants as "Project Catalyst."

25.     Also on October 16, 2017, Griggs and Moceri presented XL with a written document that they called "a model for operating the assets as student housing" ("the Operating Model"). The Operating Model was contained in an Excel workbook that contained tabs labeled as follows:  Dashboard; Unit Mix; Year 1 Proforma; T-12; Closing – RE Tax – Cap Ex; Monthly

6

Cashflows; Annual CFs (Fiscal Year); Annual CF's (Calendar Year); AM Tables; Unlevered Return Calcs; Levered Return Calcs; and, Waterfall.

26.     The Operating Model expressly stated that the model going forward was predicated upon the historical operations and financial performance of those properties for the twelve month period commencing September 1, 2016 and ending August 31, 2017.  The Operating Model essentially was maintaining a revenue and cost trajectory (within some minor adjustments and inflation increases) that reflected how the student housing component operated historically.

27.     Additionally on October 16, 2017, Griggs and Moceri presented XL with a link to a virtual data room captioned "Acquisition Data Room" that contained the information provided by the seller of the properties regarding the historical performance of the three student housing properties; and with a link to a virtual data room captioned "Development Data Room" that contained information provided by Griggs and Moceri regarding the future mixed use development of the site.

28.     The Operating Model, as well as the information provided in the Acquisition Data Room showed that the historical operations of the student housing component of Project Catalyst was stable and highly profitable, grossing over $15,000,000 per annum.  The Austin college student housing market was at the time and continues to be one of the hottest in the country.

29.     And in their email to XL of October 16, 2017, Griggs and Moceri told XL that they "expect close to double digit cash flows in year 2", predicated on their vast expertise and knowledge of the Austin student housing market.

30.     Griggs and Moceri intended that XL rely, and XL did in fact reasonably rely, on the Griggs / Moceri investment book, the Operating Model, the information contained in the Acquisition Data Room and the information contained in the Development Data Room.

31.     The Project Catalyst investment opportunity offered by Griggs and Moceri to XL was that each of XL on the one side, and Griggs and Moceri on the other, would own a 50% beneficial ownership interest in a management company ("BP Riverside Manager, LLC") that would own 12% of the entity ("BP Student Holdings, LLC") that would directly, or through a subsidiary, purchase the 3 student housing properties and retail shopping center.  The remaining 88% interest would be owned by another investor who would invest directly into BP Student Holdings, LLC".

32.     As a critical further inducement for XL to invest in Project Catalyst, Griggs and Moceri provided the opportunity for XL to increase its beneficial ownership interest on a pari passu basis with Griggs and Moceri (increasing its ownership interest from 6% to 12%).

33.     In a document titled "Preliminary Loan Quote" dated October 13, 2017, a copy of which was provided to XL on or about October 16, 2017, Presidium was named as the "sponsor" of the Project Catalyst investment opportunity.

34.     In reasonable reliance upon the information, representations and promises made by Griggs and Moceri about Project Catalyst and an investment therein, XL decided to make the investment in Project Catalyst.

35.     XL funded its $2,677,582.16 capital contribution into a funding vehicle established by Griggs and Moceri named BP Riverside Investor, LLC.

36.     Griggs and Moceri, through an entity that they beneficially owned, funded their $2,677,582.16 into BP Riverside Investor, LLC through a subsidiary that was 50% owned by Griggs and 50% owned by Moceri.

{00352168.DOCX }

37.     BP Riverside Investor, LLC contributed the $5,355,165.20 of aggregate capital contributions made by XL and Griggs / Moceri to BP Riverside Manager, LLC.

38.     The funding by XL, Griggs, Moceri, the 88% investor and the purchase of the 3 student housing properties simultaneously occurred on April 6, 2018.

39.     Because of Griggs and Moceri being in Texas, having brought this investment opportunity to XL, their represented expertise in the Austin student housing market and because they had painstakingly ingratiated themselves with the beneficial owner of XL, XL assented to Griggs and Moceri acting as the manager for BP Riverside, which unbeknownst to XL was critical to their scheme and plan of dilution and elimination of XL for their personal benefit.

40.     At the time that Griggs and Moceri participated with XL in the Project Catalyst investment, having the keys to the castle as managers, Griggs and Moceri deliberately deceived XL and fraudulently induced XL with no intention of continuing with student housing rentals or keeping XL in the deal.

41.     Unbeknownst to XL, Griggs and Moceri only wanted XL for its $2,677,582.16 capital contribution so that Griggs and Moceri would have enough capital to purchase BP Riverside Manager's ownership interest in BP Student Holdings, LLC.  It was through BP Riverside Manager, that XL's beneficial ownership interest on the one hand, and Griggs and Moceri's on the other hand, was acquired.  In other words, there was an equal initial capital contribution that purchased their respective beneficial ownership interests in Project Catalyst which was a mandated requirement for Griggs and Moceri to complete the acquisition.

42.     Also, what XL did not know at the time of making the investment in Project Catalyst was that according to Griggs and Moceri, they thought that the ultimate beneficial owner of XL was a "shadowy and extremely mercurial" person with a "philosophy in owning rental real

9

{00352168.DOCX }

estate [as] that of a true 'slumlord'". This was contrary to the outward praise that they had piled on for years, even calling the principal their "mentor," as Griggs and Moceri now had reached the tipping point where the financial backing from XL's principal was no longer needed and the royal screwing on this and other deals to optimize their position to the detriment of XL could and did begin.

43.     As such, it was clear from the outset of the entreaty to participate in Project Catalyst, that Griggs and Moceri had no further interest in a partnership with anyone they apparently held in low regard, but wanted his money for their own devices.

44.     The 88% investor in Project Catalyst is a very large, international, Swiss based private equity firm, with a stellar reputation, named Partners Group AG.  There is no doubt that this powerhouse would never knowingly go into a deal with a shadowy, slumlord, if that was, in fact, the case (which it was not).

45.     So while Griggs and Moceri needed XL's money to get the deal off the ground, once XL was no longer needed, the second part of their Florida RICO scheme to get rid of XL, at XL's expense and to the economic benefit of Griggs and Moceri began.

## THE ELIMINATION OF XL – PART TWO OF THE RICO SCHEME

### A.     The Earnout Capital Call

46.     As alleged above, the funding of Project Catalyst and the acquisition of the 3 properties all occurred on April 6, 2018.

47.     The day before, on April 5th, the following emails were exchanged between and/or on behalf of the parties:

From: **Cross Moceri** <cmoceri@presidiumre.com>
Date: Thu, Apr 5, 2018 at 3:08 PM

Subject: RE: Potential Catalyst Structures
To: Daniel Ronen <dronen@hallingmeza.com>, Andrew Fischer
<afischer827@gmail.com>, Matthew S. Meza <mmeza@hallingmeza.com>
Cc: John Griggs <jgriggs@presidiumre.com>, Michael Fischer <fsh13148@mac.com>

Hi Andrew, just for further clarity as the email I send back in January is stale as it relates
to the partnership structure that has been fully baked now:

**Our entity is require to fund $6M upon receipt of the full entitlements, and you can
participate in half of that per our partnership agreement.** Funding of additional
amounts of the additional fee (which could be up to $16M), is contingent upon approval
of Partners Group. [Emphasis Added]

All of that is documented in the op agreements we sent over.  I left you a message, so call
me if you have any questions.

Looking forward to another successful closing!

Thanks


**From:** Daniel Ronen <dronen@hallingmeza.com>
**Sent:** Thursday, April 5, 2018 1:39 PM
**To:** 'Andrew Fischer' <afischer827@gmail.com>; Matthew S. Meza
<mmeza@hallingmeza.com>
**Cc:** Cross Moceri <cmoceri@presidiumre.com>; John Griggs
<jgriggs@presidiumre.com>; 'Michael Fischer' <fsh13148@mac.com>
**Subject:** RE: Potential Catalyst Structures

Andrew,

**I just touched base with Cross.  We prefer not to have a side agreement.  The
operating agreement provides that the Manager can make a capital call when the
CPP kicks in, and you are entitled to fund 50% if you choose.** [Emphasis Added] We
prefer not to have a side agreement since the operating agreement already covers what
was agreed upon. This is the same additional capital concept that was agreed upon for
Maine.

Please give me a call if you would like to discuss further.  Also, please send the signature
page and wire confirmation when available.

Thanks,
Daniel

Daniel Ronen

**HALLING | MEZA LLP**
dronen@hallingmeza.com
Office:  (818) 222-4994
Mobile: (310) 498-0601

48.     In the email threads above, Griggs and Moceri confirm, represent and promise, that the contractual documentation for Project Catalyst provides XL, on the one hand, and Griggs and Moceri, on the other, the iron clad opportunity for each to increase their respective beneficial ownership interest in Project Catalyst post  closing by 6%.  As the email threads state, this was a material inducement for XL to agree to fund its portion of the initial capital contribution.

49.     Obviously, Griggs and Moceri intended XL to rely upon these representations and promises and XL did in fact so reasonably rely.  The trigger for this increase would be the successful receipt of certain zoning approvals which would allow for a higher density of construction and concomitantly increase the projects cash flow and value.

50.     However, as previously alleged, Griggs and Moceri never intended to allow XL to keep its beneficial ownership interest in Project Catalyst, let alone allow it to increase its percentage of ownership interest, which would be sensible and optimal for an appreciating asset. As a result of the zoning change, XL's fixed $6m option has a market value of approximately $18,000,000, and a potential revaluation in the $20,000,000-30,000,000 range.

51.     Having apparently received the sought after zoning approvals, on September 29, 2020, Griggs and Moceri caused BP Riverside Investor, LLC to make a capital call that with respect to the seller's earnout payment[2] which provides  in relevant part as follows:

---

[2] The letter was not accompanied by any meaningful project plans, financials or other requested documentation that XL had been requesting for many months.  Griggs and Moceri, controlling the enterprise and as managers refused to provide this information in order to further frustrate XL and discourage its continued participation and funding of unsubstantiated capital calls.

12
WALDMAN BARNETT
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

We are making a BP Riverside Investor, LLC capital call in the amount of $1,560,000.00 to be funded as follows:

| BP Riverside Investor, LLC - Earnout Payment | | |
|---|---|---|
| Entity | % Ownership | $ Amount |
| Presidium BP, LLC | 50% | $ 780,000 |
| XL Catalyst, LLC | 50% | $ 780,000 |
| Total | 100% | $ 1,560,000 |

The projects, formerly known as Ballpark East, West, and South, were successfully up-zoned to Corridor Mixed Use with the City of Austin back in October 2019. The successful up-zoning triggered an Earnout Payment in the amount of $13,000,000 that is owed to the Seller. The Earnout Payment is now coming due on October 27th 2020. BP Student Holdings LLC is making a $1,560,000 capital call from BP Riverside Investor LLC and Partners Group Hamilton Holdings LLC to fund the earnout payment. BP Riverside Investor LLC's portion of this capital call is $1,560,000.

**Equity percentages will remain the same, and this capital call will increase the equity contribution from each investor.** [Emphasis Added]

All capital contributions should be paid in U.S. dollars by no later than October 9th, 2020 to the following account by wire [transfer]:

52.     The capital call notice referenced above is completely contrary to everything that Griggs and Moceri represented in the email threads set forth above.  But, however, and as alleged more specifically in the paragraphs that immediately follow, the capital call notice is completely consistent with the RICO scheme of Griggs and Moceri to ultimately wipeout XL's interest in Project Catalyst as it resulted in the complete extermination of XL's right to increase its ownership in Project Catalyst by 6%.

53.     Among other unlawful aspects of the capital call notice, it does not provide for:  the $6 million payment to be split evenly between XL on the one hand, and Griggs / Moceri on the

{00352168.DOCX }

other; and, the increase in ownership interest by 6% for each of XL one the one hand, and Griggs / Moceri on the other hand upon both sides paying their share of the capital call.

54.     In addition to the opportunity for XL to increase its ownership interest by another 6% completely disappearing in the capital call, the significantly reduced amount that Griggs and Moceri are purporting to be requiring to be paid by each side, i.e. $780,000, results in NO increase in ownership because that is exactly what Griggs and Moceri wanted as part of the scheme, and as a consequence that is exactly what the capital call notice states.

55.     XL has notified Griggs and Moceri that the capital call will not be paid, other than into the escrow account of the undersigned's law firm, under protest and with full reservation of rights.   Subsequently, XL made that payment in the amount of $780,000 into the undersigned firm's escrow account.

56.     In response, on October 12, 2020, Griggs and Moceri caused Presidium to issue a notice of default, the consequences of which is a decrease in XL's beneficial ownership interest, and an increase in the beneficial ownership interest of Griggs and Moceri, should they make their share of the capital call payment.  In other words, Griggs and Moceri get to coopt a portion of XL's beneficial ownership interest for themselves - - against XL's will and without even paying XL for it, which has been their plan since inception.[3]

57.     In fact, as previously alluded to, which foreshadowed the action he and Griggs would take just two months later, Moceri in an email dated July 28, 2020, disclosed the true racketeering plan that was intended from day one. In that email, Griggs and Moceri told XL that

---

[3] As noted earlier, upon information and belief Griggs and Moceri through the use of their Presidium enterprise victimized other investors with a scheme similar to this one.

{00352168.DOCX }

with respect to Project Catalyst that there would be "significant upcoming capital calls initiated. So rather than face dilution, it should be preferable for Fischer to sell his interests now."

58.     The only missing thing from this threatening email was the fact that they were also going to modify things and disappear any right XL had to increase its interest.  This was confirmed in the recent October 26, 2020 letter from Griggs and Moceri's counsel, which confirmed the "modification" of the contract right of XL to increase its interest without any justification.

59.     As such, in both July and October correspondence directed by Griggs and Moceri were sent essentially stating we will do as we please, you cannot win, you will never have a greater interest, we will capital call you to death and either try to keep up --  good luck--  and if you object (like you now have) we will dilute you for our benefit if you don't surrender and sell out.  This lawsuit is XL's response to these threats and wrongful acts.

**B.**     **Griggs and Moceri Intentionally Destroy the Profitable the Student Housing Apartment Rental Business and Announce their Intention to Convert the Apartments into Multi-Family Rental Units**

60.     Griggs and Moceri, through its enterprise, Presidium, had the responsibility for managing Project Catalyst post its acquisition on April 6, 2018.

61.     Moceri works from Presidium's Austin, TX offices, which are located within miles of the Project Catalyst complex.

62.     The Austin college student housing market was and continues to be one of the hottest in the country going back many years prior to the April 6, 2018 acquisition of 3 properties comprising Project Catalyst.

63.     Within just over 18 months from   April 6, 2018 and after expending over $2,000,000 in alleged student housing improvements, Griggs and Moceri caused Presidium by

email dated November 22, 2019 to notify XL that the historical use of college student housing would end and be converted into multi-family units without first consulting with XL as required.[4]

64.     As alleged above, the project that Griggs and Moceri sold to XL was college student housing - - and not multi-family rentals.  And the Operating Model provided by Griggs and Moceri was a carryforward of the actual performance of the units rented as college student housing - - and not multi-family rentals.

65.     And based on that Operating Model carryforward, Griggs and Moceri represented to XL by email dated October 16, 2017, that they "expect close to double digit cash flows in year 2" post the closing.  Instead, when they threatened to capital call XL until he screamed "Uncle", this incredibly profitable business pre-acquisition had a negative cash flow! And gross income slid from $15,100,000 from purchase to $11,500,000 by the end of 2019.  The roll forward financial model had gross revenue at $17,000,000 at year end 2019 - - which is a far cry from the actual gross revenue of $11,500,000.  This drop in revenue resulted in the cash flow of the project to pay for debt service and other expenses of the project to also disappear, and thus the implementation of that portion of the RICO scheme to begin to capital call XL to death.

66.     As such, to incentivize XL to want to surrender its investment in Project Catalyst for substantially less than it's worth and/or dilute XL's interest through capital calls for a project that was not the one sold to XL, Griggs and Moceri caused the historical profitable operations of the student housing apartments to be disregarded and ran that business into the ground, in order for XL to fund sustainably more capital while at the same time Griggs and Moceri reaped

---

[4] And since misrepresenting the project and concealing their intent was part of their RICO scheme, Griggs and Moceri completely ignored their fiduciary duty they had to discuss with XL in advance the contemplated material change in the project.

substantial asset management and construction related fees in the many hundreds of thousands of dollars.

67.     And as alleged above, Griggs, Moceri and their Presidium enterprise just had too much talent and self-professed expertise (as they claim on the Presidium website) for the destruction of the Project Catalyst student housing rental business to be other than intentional for the purpose of implementing their racketeering scheme.

68.     So, not only did XL learn on November 22, 2019, that the student housing rental business was no longer (whereas on August 9, 2019 it had funded its share of a $270,000 capital call for purported additional improvements to the student housing investment), XL also learned in that same email that Griggs and Moceri caused to be made a second capital call for $500,000 in order to move forward with the new business plan which was never previously discussed with XL. After receiving the notice, XL requested the revised business plan, budget, financials, costs and returns and information relating to their intentions. Presidium has failed to answer these requests and has totally disregarded XL concerns.

69.     XL has refused to pay that second capital call for good and just reasons as stated herein and is subject to having its beneficial ownership interest in Project Catalyst diluted unless the enforcement of that wrongful capital call is enjoined by this Court.

C.     **Additional Misconduct on the Part of Griggs and Moceri Intended to Force XL out of Project Catalyst**

70.     Since the April 6, 2018 closing on XL's investment in Project Catalyst, and in order to enhance the probability that their Florida RICO Act scheme would succeed, Griggs and Moceri have through their enterprise, Presidium, engaged in a variety of acts of misconduct, which include

theft and fraud with the intent of causing XL to reach a level of distrust, frustration, dissatisfaction and concern that XL becomes desperate to be cashed out of Project Catalyst.

1.      <u>Where did the PPP Money go</u>?

71.     An example of these strong arm tactics as they relate to fraud is embodied in the contents of a letter which the undersigned sent to Presidium's General Counsel with respect to potential criminal matter involving another Presidium investment that the ultimate beneficial owner (which is the same as the ultimate beneficial owner of XL) has a 75% ownership in the investment:

October 14, 2020

Via Email
Matthew S. Meza, Esq.
1601 Rio Grande, Suite 300
Austin, TX 78701
mmeza@presidiumre.com

Re:     Paycheck Protection Program ("PPP")

Dear Mr. Meza:

Because of the potential criminal liability for the misuse of PPP funds received by Presidium and allocated by it to Houston Cluster and Shenandoah Woods, we are putting you on notice that my clients will hold Presidium and its executive officers liable for any and all misuse of those funds.

We note that notwithstanding efforts made by my clients prior to the filing the Houston Cluster to obtain an accounting for how those funds were used (if used at all) and the account(s) in which those funds were deposited, Presidium has refused to provide any such information.

Even more baffling, despite the filing of the Houston Cluster lawsuit, where the PPP issue was alleged, Presidium still refuses to provide any such information.

The property manager has separately requested that those allocated PPP funds be released so that it can be used to fund payroll as intended by the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") and the Paycheck Protection Program

WALDMAN BARNETT
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

{00352168.DOCX }

thereunder.  Again, Presidium remains silent and has done nothing as far as we know to utilize those funds consistent with law.  Silence and inaction just doesn't cut it.  Once again, my clients demand immediate release of those funds so that the property manager can use same for payroll payment purposes.

While my clients will not be holding their breath waiting for Presidium to do what is legally required both as to the PPP funds and its fiduciary and other legal responsibilities to my clients, we are using this opportunity to go on record to document where culpability lies should there be criminal or any other type of action taken by any governmental agency (or other parties) with respect to misuse of PPP funds.

Sincerely,

Glen H. Waldman, Esq.

72.     In response and true to form, on October 26, 2020 counsel for Griggs and Moceri responded with: stay out of it, we are in control, the property manager (that you replaced us with) has no authority, and we will do as we see fit.

2.     <u>Where did $2 million dollars in refinance money go?</u>

73.     Another recent example of these strong arm tactics, as it relates to theft and to further increase the pressure on the beneficial owner and to further their ill-gotten ways occurred when Griggs and Moceri, through their enterprise Presidium, spearheaded a re-finance transaction with regard to another investment 75% of which is co-beneficially owned by XL's beneficial owner and family on the one hand, and 25% by Griggs and Moceri on the other, which resulted in over $2 million in net proceeds.  Instead of distributing the net proceeds to the respective investment vehicle entities, Griggs and Moceri have held on to the money, refused to distribute the proceeds, refused to disclose where the money is, refused to provide bank verification that the

money is in an account[5] and are holding this money hostage in an effort to further leverage a low buy-out of XL's interest in Project Catalyst.

3.   <u>Not so Pleasant in Pleasant Valley.</u>

74.    Another similar scheme to Project Catalyst, involving Griggs and Moceri, is called Pleasant Valley.  This is a 5.6 acre parcel of developable vacant land located in Austin, Texas where, based on the urgings and representations of Griggs and Moceri, XL went into the deal with them on a 50:50 basis.

75.    In 2018 after the initial capital was depleted Griggs and Moceri sought financing from several banks including Golden Bank and First State Bank based on fictitious and fraudulent numbers they provided to the Banks.  The Banks, relying on the numbers provided by Griggs and Moceri, issued term sheets.  They flew to Miami and presented the term sheets to XL's beneficial owner who after reviewing them for the first time and understanding that the numbers could not be true refused to proceed forward as he did not wish to be complicit in bank fraud.

76.    Griggs and Moceri went to Plan B.  Subsequent to April 2018 they threatened that if XL did not agree to fund a capital call (as an alternative to bank financing), as manager they would proceed to encumber the property with debt which would put the entire investment in jeopardy.   XL's principal, who was quite ill at the time, relented and funded the capital call in order to try to save his investment without being complicit in bank fraud.

77.    At the time of this funding in 2018, there was supposed to be $2.174 million in the checking account. Since that time the funds have been depleted with nothing to show where the

---

[5] It also appears that Griggs and Moceri have committed bank fraud by providing overstated and false personal financial statements to banks with regard to certain of these investment projects in order to convince various institutions to provide money and further disproportionately leverage their interests, as alluded to with respect to Pleasant Valley and Westpark discussed below and others. Subpoenas will be sent to ferret out these issues as well.

money went.[6]  Now Griggs and Moceri have issued a $500,000 capital call on this vacant property with no explanation, no back-up detail, no financials and no bank statements.  Once again, XL has refused owing to insufficient data or explanation and once again Griggs and Moceri are seeking to dilute XL's interest owing to its refusal to be complicit in fraudulent activity.

4.    West Park:  Deja Vu all Over again:  More fraud.

78.    In 2015, XL invested with Presidium at the urging of Griggs and Moceri in a 115,000 square foot office building called West Park.

79.    In October 2018, Presidium attempted again to strong-arm XL to refinance the current loan balances of $4.65 million dollars for an increase to $6.25 million dollars at a debt service of $440,000 (wherein the current debt service is $244,000).  After reviewing what was sent to SunTrust Bank and what was provided to the project partners, it was clear to XL that the capital expenditures were not consistent with the financial reporting.  As such, Griggs and Moceri once again provided fraudulent financial statements to financial institutions to fit their scheme, as there is not enough real income to cover the actual debt service.

80.    What is clear is that Griggs and Moceri have provided two sets of financial statements, one set to financial institutions that reflect great performance and a wholly different set which are likely the actual true picture to XL and others in the deal which show a far more dismal reality.[7]

---

[6] This was apparently wasted (on among other things $1million dollars on tents and portable lavatory's which were placed on the property without permits.  Consequently, the City subsequently required them to be removed at a complete loss).

[7] Moreover, XL has come to learn that with respect to Pleasant Valley and West Park, Griggs and Moceri have surreptitiously engaged outside third-party developers looking to move forward with these projects without XL, once their dilution schemes are sufficiently advanced.

WALDMAN BARNETT
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

{00352168.DOCX }

81.     Finally, the capital calls have once again started with a current one of $145,833 and threats of additional capital calls to follow. This is a clear indication of fraud and manipulation, as this building was purchased at $60/sq. ft. and has maintained occupancy in the 90% range while trying to push XL out.  As such, this begs the question, where has the cash-flow disappeared to (especially as the last investor statement provided show a Net Operating Income over $500,000 of positive income)?  The answer is clear, further theft by Griggs and Moceri and further efforts to buttress their scheme to drive XL to surrender and accept a buy-out for pennies on the dollar.

82.     All conditions precedent to Plaintiff's claims have been met, waived or otherwise satisfied.

83.     Plaintiff has retained the undersigned law firm to represent its interests in this case and has agreed to pay the firm a reasonable fee for its services.

## COUNT I

## FLORIDA RICO ACT § 895.03(3)

84.     Plaintiff re-alleges the allegations in paragraphs 1-69 and 82-83 of this Complaint as if those allegations are set forth herein.

85.      As the co-founders, co-owners and co-chief executive officers of Presidium, both Griggs and Moceri are persons employed by and associated with an enterprise in accordance with Section 895.03(3) of the Florida RICO Act.

86.     Presidium is a limited liability company and as such is an "enterprise" as defined under Section 895.01(5) of the Florida RICO Act.

87.     Presidium is an enterprise engaged in and whose activities affect interstate commerce.

88.     Griggs and Moceri agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of (a) intentionally defrauding XL into investing in Project Catalyst and (b) thereafter for the unlawful purpose of attempting to eliminate XL's beneficial ownership interests in Project Catalyst, the direct result of which would be to coopt and misappropriate the benefit of XL's beneficial ownership interests for the benefit of Griggs and Moceri.

89.     Griggs and Moceri used the mails and/or wires to send to XL the documents identified in paragraphs 21, 24-33 and 47 above in furtherance accomplishing the purposes of their RICO fraud scheme.  Such actions constitute mail fraud and/or wire fraud in violation of 18 U.S.C. § 1961(1) which defines "racketeering activity" as including mail fraud 18 U.S.C. § 1341 and wire fraud 18 U.S.C. § 1344.

90.     The predicate acts alleged above pertaining to the fraudulent inducement to invest in Project Catalyst constitutes racketeering activity under § 895.02(8)(a)11, Florida Statutes (Chapter 517, relating to sale of securities and investor protection) and under § 895.02(8)(b), Florida Statutes (any conduct defined as "racketeering activity" under 18 U.S.C. § 1961(1).

91.     The predicate acts alleged above pertaining to the scheme to eliminate XL's beneficial ownership interest in Project Catalyst constitutes racketeering activity under:   § 895.02(8)(a)11, Florida Statutes (Chapter 517, relating to sale of securities and investor protection);  § 895.02(8)(a)32, Florida Statutes (Chapter 812, relating to theft…); and, 895.02(8)(a)34 (Chapter 817, relating to fraudulent practices, false pretenses, fraud generally…).

92.     The scheme to eliminate XL's beneficial ownership interest in Project Catalyst is ongoing as of the date of the filing of this Complaint and will continue unless enjoined by this

WALDMAN BARNETT
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

Court.

93.     The predicate acts alleged above constitutes a pattern of racketeering activity under§ 895.02(7) because there were at least two incidents of racketeering conduct that have the same or similar intents, results or accomplices and victims and are otherwise interrelated by distinguishing characteristics and are not isolated incidents, the last of which occurred within 5 years after a prior incident of racketeering conduct.

94.     Griggs and Moceri have directly conducted and participated in the conduct of Presidium's affairs through the pattern of racketeering and activity described above, in violation of § 895.03(3), Florida Statutes.

95.     As a direct and proximate result of Griggs' and Moceri's racketeering activities and violations of § 895.03(3), Florida Statutes, XL has been and continues to be injured as a result of Griggs' and Moceri's scheme to coopt and misappropriate the benefit of XL's beneficial ownership interests for the benefit of Griggs and Moceri.

WHEREFORE, Plaintiff, XL Funding, Inc., demands entry of a judgment against Defendants, John J. Griggs III and Cross K Moceri:

a)  for three times the amount of its damages pursuant to § 772.104, Florida Statutes;

b)  attorney's fees pursuant to § 772.104, Florida Statutes;

c)  costs;

d)  prejudgment interest; and

e)  all such other relief as this Court deems just and proper.

WALDMAN BARNETT
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

## COUNT II

## TEMPORARY AND PERMANENT INJUNCTION

96.     Plaintiff re-alleges the allegations in paragraphs 1-83 of this Complaint as if those allegations are set forth herein.

97.     Griggs' and Moceri's Florida RICO Act scheme against XL has not been completed, is continuing and will continue into the future until, and has been and will continue to cause irreparable harm to XL for which there will be no adequate remedy at law.

98.     Any monetary judgment in this case will only potentially compensate XL for past losses and will not stop Griggs and Moceri from their RICO scheme quest to completely extinguish XL's beneficial ownership interest in Project Catalyst.

99.     XL has a substantial likelihood of success on the merits of its Florida Rico Act claim.

100.    Finally, the public interest will be served by stopping the illegal acts of Griggs and Moceri.

WHEREFORE, XL requests that the Court issue first a temporary injunction and ultimately a permanent injunction to enjoin Griggs and Moceri from:

a.   enforcing and/or causing to be enforced any of the outstanding, unpaid capital calls levied against XL;

b.   issuing and/or causing to be issued any further capital calls;

c.   taking and/or causing to be taken any action to reduce XL's 50% beneficial ownership interest in BP Riverside Investor through the adjustment of the capital accounts or otherwise;

WALDMAN BARNETT
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

{00352168.DOCX }

d.   seeking to reduce XL's current 6% beneficial ownership interest in Project Catalyst through diluting BP Riverside Investor's 100% ownership interest in BP Riverside Manager or through any other actions that would result in a dilution of that 6% beneficial ownership interest;

e.   taking any unilateral action regarding the issuance of any further capital calls and requiring that XL and Griggs / Moceri either agree on the amount, necessity, timing and funding into an account of an independent disbursement agent who will the make 3rd payments in accordance with the joint instructions of XL and Griggs / Moceri or having a person appointed by the court do so.

f.   taking any unilateral action on how to deal with the outstanding capital calls (e.g. amount, necessity, funding into an account of an independent disbursement agent who will then make 3rd payments in accordance with the joint instructions of XL and Griggs / Moceri) or to have a person appointed by the court do so;

g.   authorizing XL's right to exercise its 6% option in Project Catalyst and,

h.   committing any act of racketeering against XL in violation of the Florida RICO Act, including those alleged in this Complaint.

**<u>Demand for Jury Trial</u>**

Plaintiff demands trial by jury of all claims so triable.

Dated this 30th day of October, 2020.

WALDMAN BARNETT
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

{00352168.DOCX }

Respectfully submitted,

WALDMAN BARNETT, P.L.
3250 Mary Street, Suite 102
Coconut Grove, Florida 33133
Telephone:  (305) 371-8809
Telecopier:  (305) 448-4155
FOR SERVICE OF PLEADINGS:
liteservice@waldmanbarnett.com

By: */s/Glen H. Waldman*
        Glen H. Waldman, Esq.
        Fla. Bar No. 618624

{00352168.DOCX }