**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 20-cv-24782-CIV-ALTONAGA/Torres**

XL FUNDING, INC.,

      Plaintiff,

v.

JOHN J. GRIGGS III, an
Individual; and CROSS K.
MOCERI, an individual

        Defendants.

_____/

## PLAINTIFF XL FUNDING, INC.'S OPPOSITION TO MOTION TO DISMISS

Plaintiff XL FUNDING, INC. ("XL" or "Plaintiff") hereby files its Opposition to Defendants JOHN J. GRIGGS III ("Griggs") and CROSS K. MOCERI ("Moceri")(collectively, "Defendants") Motion to Dismiss, and in support thereof states as follows:

## INTRODUCTION

Defendants have had a fifteen year business relationship with XL (a company based in Florida) and its principals (whose principal residence is in Florida). Project Catalyst (also referred to as "Ballpark")—the subject of the Complaint—is just one of the thirteen ongoing projects that Defendants have with XL or its principals in which (i) Defendants solicited funds from XL's principals (Florida residents), (ii) funds were provided from Florida; and (iii) Defendants directed constant communications to Florida. This is clearly a situation, as further explained below, in which Defendants have purposely availed themselves of Florida and subjected themselves to jurisdiction in the State.

1

Further, Defendants effort to claim that XL does not have standing or is otherwise not the real party of interest is unfounded because—among other things—XL provided the $2,677,582.16 capital contribution (from, incidentally, a Florida bank account) that XL, in the Complaint, alleges Defendants are dissipating. Defendants' efforts to compel arbitration are equally unfounded **because neither Defendants nor XL is a party to the agreement containing the arbitration clause**. Realizing that this fact is dispositive of their arbitration argument, Defendants spend much of their introduction making an apparent judicial economy argument: that this case is related to other cases being arbitrated in Texas. This argument is not only improper (as it goes outside the four corners of the complaint), but also without merit because the existence of those disputes does not change the fact that this RICO case—as further explained below—does not fall within the relied upon arbitration clause. Moreover, the impetus for this argument is that Defendants (Texas based) and their attorneys (Texas based) would prefer to have this matter in an arbitration in Texas. Again, this is not a proper motion to dismiss argument. XL (Florida based) has every right to institute this action in its home state and have it tried here. Lastly, Defendants final argument of their four point attack on the Complaint—that XL has not satisfied the RICO requirements—also fails for the reasons stated below.

## UNCONTESTED (OR NOT AFFECTIVELY CONTESTED) JURISDICTIONAL FACTS[1]

1.      Both Griggs and Moceri have multiple contacts with XL in Florida, including numerous contacts specifically related to Project Catalyst. [D.E. #41, ¶17].

---

[1] XL cut and paste the below uncontested facts from its Amended Complaint [D.E. #41].

2

2.      As an initial matter, both Griggs and Moceri have met in person with XL's principals in Miami-Dade County, Florida multiple times. *See id.* ¶18.[2]  This includes—at least as to Moceri—trips to Miami-Dade County, Florida with respect to Project Catalyst—the subject of this action where inducements and representations were made to further their scheme and plan. *See id.* ¶18.

3.      Michael Fischer, Andrew Fischer, Svetlana Astafurova and the Fischer family—the principals of XL Funding, Inc.—have been in business with Griggs and Moceri since approximately 2006. *See id.* ¶19.  Michael Fischer—who recently passed—primarily lived in Miami-Dade County, Florida with his partner—Svetlana Astafurova—and their school age children who attend school in Miami-Dade County, Florida.  Andrew Fischer's primary residence at all relevant times was also in Miami-Dade County, Florida. *See id.* ¶19.[3]

4.      When pitching Project Catalyst to the XL principals or otherwise seeking XL's financial investment in Project Catalyst, Moceri and Griggs (either individually or through Presidium) directed their communications to the XL principals in Florida or at least suspecting that they were in Florida—which, again, is where they primarily lived and maintain offices. *See id.* ¶20.

---

[2] Griggs denied meeting XL in Miami regarding Project Catalyst but does not deny traveling to Miami multiple times to meet XL's principals in regards to other projects.

[3] Defendants do not deny that Andrew Fischer (XL's President who was included on almost all correspondence and calls relative to Project Catalyst) lived in Miami at all relevant times and XL's principal place of business is Florida. *See* Cross Moceri Deposition Transcript ("Moceri Dep.") pg. 14, attached as **Exhibit 1**; John Griggs Deposition Transcript ("Griggs Dep."), attached as **Exhibit 2**, pgs. 21-24; [D.E. #42-10, pgs. 54-55](acknowledging the Andrew Fischer was President of XL until January 2020).

3

5.     Griggs and Moceri further directed numerous telephone calls (and requests for conference calls) and communications to the Fischers in Florida in regards to Project Catalyst and other real estate projects with the Fischers.  In fact, generally, the Fischers and Griggs/Moceri, were in contact multiple times monthly in regards to their joint real estate projects, including Project Catalyst. *See id.* ¶21.[4]

6.     Indeed, in association with jurisdictional discovery, XL produced over 593 pages of such communications and Defendants produced over 12,000 pages of documents (many of which reflected these communications). *See id.* ¶22.

7.     Further, Griggs and Moceri (either individually or through Presidium) sent physical documents regarding the financials underlying their multiple joint real estate projects with Fischer entities (including Projects Catalyst) to Miami-Dade County, Florida.  *See id.* ¶23.

8.     Griggs and Moceri—through their company—sent the very default notice relative to a missed Project Catalyst capital call which—in part—precipitated this litigation to a Fischer entity at 800 Washington Ave., Suite 112, Miami Beach, Florida 33139.  *See id.* ¶24.

9.     PG Investco, LLC—a company of which Moceri/Griggs are the sole managers— entered into the purchase agreement for one of the properties that makes up Project Catalyst (Park Green).  *See id.* ¶25.  This Griggs/Moceri entity has sought and received permission from the Florida Division of Corporations to do business in Florida—an authorization that is current.  *See id.* ¶25.

---

[4] As the above and below facts establish, Defendants clearly knew—when making calls to or setting us call with XL (a Florida business) and its principals (who reside in Florida)—they were making contacts with Florida.  Defendants—at their deposition—made every effort to distance themselves from this plain fact, but finally admitted (only when shown incontrovertible emails) that Defendants initiated calls or contacts with XL principals in Florida.  *See, e.g.*, Moceri Dep., pg. 68; Griggs Dep., pg. 32.

10.      XL provided to Griggs/Moceri (through a title company) its $2,677,582.16 capital contribution for Project Catalyst from a Florida bank account with City National Bank located at 446 Collins Avenue, Miami Beach, FL 33139.  *See id.* ¶26; *See* Bank Statement, **Exhibit 3**;

11.      In addition to Project Catalyst, XL's principals and Moceri/Griggs had a multiplicity of other Florida contacts as to their various other projects (approximately 13 ongoing projects) with XL's principals.  *See id.* ¶27; *see also* Project Chart, **Exhibit 4**.  This included Moceri and Griggs making trips to Florida to conduct due diligence to a potential project with XL's principals in Hollywood, Florida. This further includes communications relative to potential projects in Miami, Florida, Gainesville, Florida and Jacksonville, Florida.  *See id.* ¶27.

12.      It is believed that Presidium maintains or, at all relevant times, maintained an office in the State of Florida located at 228 Canal Blvd., Unit 4, Ponte Vedra Beach, FL 32082.  *See id.* ¶28.

13.      Finally, at least since 2017, Presidium has engaged in developing and building significant real estate projects in the Jacksonville, FL area and each of Griggs and Moceri have made personal appearances in Florida in connection therewith.  *See id.* ¶29.

## ADDITIONAL FACTS

14.      A majority of the RICO predicate acts alleged in the Complaint occurred before (a) XL Catalyst was even formed on April 4, 2018; and (b) the operating agreement on which Defendants rely for their defense was executed on April 6, 2018.[5]  *See* Fla. Div. of Corp., **Exhibit 5**; [D.E. #42-9]; [D.E. #41, ¶¶30-43]; [D.E. #42-9].

_____

[5] The operating agreement Defendants rely on is dated November 1, 2018, but asserts the original was dated April 6, 2018. [D.E. #42-9, pgs. 2 and 6].  Defendants, however, did not attach a copy. Regardless, even if executed on April 6, 2018, this post-dates many of the predicate acts referenced in the Complaint which date back to January 20, 2017.

15.     As noted, Defendants and XL (which was incorporated in 2003) have been in business together since 2006.  *See* Fla. Div. Corp., **Exhibit 6**; *supra* ¶3.   XL's was authorized to transact business in Florida in 2011 and XL's principal place of business is in Miami-Dade County, Florida.  *See id.*; [D.E. #41, ¶13].  In dealing with Defendants, the Fischers were acting on behalf of XL until April 4, 2018 when XL Catalyst was formed and, even after that incorporation, XL was serving as manager for XL Catalyst.  *See* Dan McKenna Declaration ("McKenna Decl."), ¶4, **Exhibit 7**.

16.     Defendants' usual relationship with XL in regards to their multiple real estate projects (including their 13 existing projects) is that Defendants solicited monies from XL for their real estate projects and XL—in turn—provides funds and serves as a silent partner in the projects. *See* Moceri Dep., pg.14.

17.     Project Catalyst was similar to the other 12 projects, Defendants solicited funds from XL, XL provided those funds, and XL was a limited partner in the Project.  *See* Moceri Dep., pg. 41:8-12 ("Q. you [were] looking for a financial investment from Michael Fischer or one of his companies? A. Yeah, that was -- that was typically the nature of our relationship").

18.     During their 15 year business relationship, Defendants have primarily visited the Fischers in Florida.  *See* Moceri Dep., pg. 14; Griggs Dep., pgs. 21-24.   Andrew Fischer's residence at all relevant times was in Florida—a point Defendants admit.  *See* Moceri Dep., pg. 22; Griggs Dep., pg. 41.  In the emails produced, each Defendant discussed coming to visit the Fischers in Miami or planned for others to visit them in Miami. *See, e.g.,* **Exhibit 8** ("John [Griggs] and I are thinking about a trip to Miami"); **Exhibit 9** ("Next meeting, Cross and I come to Miami!"); **Exhibit 10** ("John [Griggs] and I checked our calendars, and the week of 3/19 would work for a trip to Miami").   Further, in almost every of Defendants and Fischers 13 ongoing

projects, there is a Florida entity involved and, in fact, in most projects XL is listed in the organization chart. *See* Project Chart, **Exhibit 11**. In short, Defendants were quite aware that—when doing business with the Fischers and/or their entities—they were doing business with Florida.

<u>**ARGUMENT**</u>

## I.   XL HAS STANDING

"[T]he plaintiff has RICO standing if he shows 'a causal connection between his injury and a predicate act.'" *Williams v. Mohawk Indus., Inc.*, 465 F. 3d 1277, 1291-92 (11th Cir. 2006). Defendants argue that XL does not have standing because XL Catalyst was the party to the operating agreement and holds the interest in Project Catalyst. This argument fails for several reasons. **<u>First</u>**, XL Funding provided the $2,677,582.16 capital contribution for Project Catalyst and who stands to lose same (or substantial portion thereof) if Defendants RICO scheme persists unabated—a point which Defendants conveniently omitted and which clearly establishes the necessary injury and link to the predicate acts. *See supra*, ¶10. **<u>Second</u>**, many of the predicate acts (including fraudulent inducement date back to early January 2017, *see* [D.E. #41, ¶¶30-43]) forming the basis of the RICO claim were perpetrated before XL Catalyst (whom Defendants claim is the proper party) was even created on April 4, 2018, defeating the lack of standing argument. *See Maiz v. Virani*, 253 F.3d 641, 655 (11th Cir. 2001)(rejecting standing argument because "the majority of the alleged wrongdoing—including the primary wrong (the land price fraud)—occurred well in advance of the chartering of the corporations"). **<u>Third</u>**, the case law on which Defendants rely—*Harris* and *Crowley*—is inapplicable because those cases involved a situation in which a shareholder was deemed not to have standing because they suffered the same damages as other shareholders. That is not the case here because XL Catalyst only has one shareholder. As

7

such, there are no other shareholders.  *See id.* at 655 ("simply because the plaintiff is a shareholder of a corporation, it does not necessarily follow that he lacks standing to seek RICO damages in his own right").  Further, even if that weren't so, XL suffered unique damages different from other shareholders as it provided the $2,677,582.16 initial capital contribution which may be lost entirely (or in large part) and therefore is not "a party whose injuries result 'merely from the misfortunes visited upon a third person by the defendant's acts' lacks standing to pursue a claim under RICO." *See Harris*, 636 Fed. Appx. at 481.  For these reasons, the standing argument fails.[6]

## II.     PERSONAL JURISDICTION

Defendants assert that specific jurisdiction (which is what XL relies upon) does not exist under the Florida Long Arm Statute and/or does not satisfy the constitutional due process requirements because (a) their actions were taken in their corporate capacity and thus protected under the corporate shield doctrine; and (b) their contacts with Florida are otherwise insufficient. These arguments are unavailing.

### A.  <u>The Corporate Shield Doctrine is Inapplicable</u>

---

[6] Defendants also make a Rule 17 argument that XL Catalyst (not XL) is the real party in interest. This argument fails for similar reasons to the standing argument, including that XL has a direct personal interest because it provided the $2,677,582.16.  *See Gonzalez ex rel. Gonzalez v. Reno*, 86 F. Supp. 2d 1167, 1182 n.18 (S.D .Fla. 2000)(noting that the real party in interest and Article III standing questions are similar, and that the "notable distinctions are somewhat academic"); *Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696, 701 (5th Cir. 1973)("even a slight injury may suffice in some circumstances;  yet, the fundamental principle remains inviolate that one who has no personal stake in the outcome of the controversy always lacks standing").  Thus, this and the standing argument are without basis.  However, out of an abundance of caution, XL Catalyst ratifies this action, resolving this issue and any purported double liability argument under Rules 17 or 19.  *See* Fed. R. Civ. P. 17 ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest"); McKenna Decl., ¶8.

Defendants' corporate shield argument fails because the corporate shield doctrine is inapplicable in the intentional tort context (like here).  *See Elandia International, Inc. v. Ah Koy*, 690 F. Supp. 2d 1317, 1332 (S.D. Fla. 2010)("A corporate officer, however, is subject to jurisdiction in the forum if the corporate officer commits intentional tortious acts aimed at the forum state.  Therefore, Defendants cannot use the corporate shield doctrine to protect them individually against Plaintiff's intentional tort claims").[7]  Further, the cases on which Defendants rely involve contacts of others in the corporations (not the individual defendants) being impermissibly imputed onto the individual defendants.  That is not the case here in which a majority of the jurisdictional contacts were those of Defendants themselves and not others in the corporation.  *Allerton*, 635 So. 2d at 39("[defendants] status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum state must be assessed individually").

### B.  Long Arm Statute

Florida's Long arm statute provides that personal jurisdiction can be exercised over Defendants committing torts in the state and who have engaged in business in the state.  *See*

---

[7] *See also LaFreniere v. Craig-Myers*, 264 So. 3d 232, 238 (Fla. 1st DCA 2018)(the exception [to the corporate shield doctrine] may also encompass alleged tortious acts committed outside of Florida, if those acts involved communication directed into Florida for the purpose of committing a fraud . . . or some other intentional tort"); *Allerton v. Fla. Dep't of Ins.*, 635 So. 2d 36, 39 (Fla. 1st DCA 1994)("we conclude that the corporate shield doctrine is inapplicable to this case . . . [in which defendants] intentional torts . . . were aimed at GLS, a Florida insurance company"); *Discos Fuentes Edimusica v. S.A. v. Fuentes*, 2009 WL 10668752, *5 (S.D. Fla. Sept. 18, 2009)("the exception to the corporate shield doctrine [provides that] . . . a non-resident corporate officer may be haled into court in Florida if it is alleged that he personally committed an intentional tort expressly aimed at the plaintiff in the forum state");  *In re National Century Financial Enterprises, Inc., Inv. Litigation*, 617 F.Supp.2d 700, 710-11 (S.D. Ohio 2009)(holding that corporate shield doctrine did not apply to individual defendant against whom RICO claim was alleged because "she committed the actions in her capacity as an officer of National Century does not prevent the exercise of jurisdiction over her").

§48.193(1)(a)(1) (committing tortious act) and (1)(a)(2)(engaging in business).  As to torts, a defendant commits torts in Florida if (as here) defendant perpetrates its tort through out of state contacts to Florida, including emails, calls and correspondence.  *See Stomar v. Lucky Seven Riverboat Co., LLC*, 821 So. 2d 1183, 1187 (Fla. 4th DCA 2002)("our supreme court has just held, that 'committing a tortious act' in Florida under section 48.193(1)(b) can occur through the nonresident defendant's telephonic, electronic, or written communications into Florida").[8]  As stated in the Complaint, Defendants RICO acts consist of—among other things:

(1) fraudulently inducing XL into the investment by—among other things— indicating that the project would remain student housing and that the historic rate of return would continue as such (even though Defendants now plan to demolish the student housing in favor of rebuilding and asking XL to pay for it);

**(2)** misrepresenting that XL—after the successful re-zoning of portions of the property—a capital call would be issued under which XL had the opportunity to increase its equity ownership from 6% to 12%.

The Complaint (and production) is overflowing with examples of communications from Defendants to XL's principals in Florida regarding Project Catalyst, asking XL to invest in same, and otherwise making the misrepresentations from which the RICO claim stems, including:

- 1/20/17 Email ("we were also just awarded Project Catalyst, and we'll need some [financial] help").  [D.E. #41, ¶30]; **Exhibit 12**;

- 10/16/2017 Email ("attached are updated materials on Project Catalyst . . . we expect close to double digit cash flows in year 2").  [D.E. #41, ¶¶35-39, 42]; **Exhibit 13**;

- 10/25/17 Email setting up a call with Griggs and Moceri to discuss Project Catalyst; **Exhibit 14**;[9]

---

[8] *Exhibit Icons, LLC v. XP Companies, LLC*, 609 F.Supp.2d 1282, 1297 (S.D.Fla.2009)("Given that it is uncontested that XP Apparel made telephone calls and email communications into Florida in furtherance of a business relationship with Plaintiffs, long-arm jurisdiction would be established").

[9] Both Moceri and Griggs reinforced the misrepresentations in calls.  *See* McKenna Decl. ¶7.

- 4/5/18 Email regarding ability to increase ownership after issuance of certain entitlements on the property.  [D.E. #41, ¶57]; **Exhibit 15**;
- 10/12/2020 Notice of Default to XL sent to Miami.  *See* [D.E. #41, ¶24; 66].

*See also* Numerous Communications, Exhibits to Moceri and Griggs Depositions, **Exhibits 16** through **Exhibit 45**, attached hereto.   These communications were to Florida because XL's (and XL Catalyst's) offices are in Florida and XL's principals resided in Florida.  In fact, the default letter referenced in the Complaint was sent to XL Catalyst at 800 Washington Avenue, Suite 112, Miami Beach, Florida 33139.  *See* **Exhibit 46**.  Further, Griggs and Moceri offered to visit Miami to meet with the Fishers regarding the Project.  *See, e.g., supra*, ¶18.  Moceri, in fact, explicitly visited XL in Miami to discuss Project Catalyst and the disputed capital calls referenced in the complaint.  *See* 1/16/20 Email ("we need to address . . . the Ballpark capital contribution . . . We look forward to discussing these and other operational issues **when we see you . . . at your residence [in Miami]**");  *see also supra* ¶¶1-18 (clearly establishing that Defendants communications were to Florida).   For these reasons and because these Florida communications/visits are the very contacts that gave rise to the claims (defeating Defendants "but for" arguments),[10] Defendants clearly fall within the reach of the long arm statute.  Beyond this, the mere fact that Defendants engaged in intentional torts to a Florida based entity that caused injury to it in Florida (which is alleged and not disputed by affidavit) is sufficient to satisfy the long arm statute.  *See Enviracarbon, Inc. v. Couch*, 2011 WL 4501058, *3 (M.D. Fla. June 20,

---

[10] Defendants assert the jurisdictional contact must be the "but for" cause of the claim.  As noted, even if this were the standard, XL satisfies it.  However, this Court has interpreted the "arising from" language in the Florida long arm statute as follows: "[a]lthough the term 'arising from' is somewhat broader than the concept of proximate cause, under Florida law there must nevertheless be some 'direct affiliation,' 'nexus,' or 'substantial connection' between the cause of action and the activities within the state." *Canadian Steel, Inc. v. HFP Capital Markets, LLC*, 2012 WL 2326119, *4 (S.D. Fla. 2012)

2011)(long arm statute satisfied "provided that the tort causes an injury in Florida. The Eleventh Circuit has additionally recognized that intentional torts have been more likely to satisfy the requirements of Fla. Stat. § 48.193(1)(b) than torts involving negligence").

Lastly, and as an additional ground, Defendants fall within the "conducting, engaging in, or carrying on a business" section of the long arm statute as Defendants have carried on business with XL's principals in Florida for 15 years (not to mention engaging in two large developments in North Florida) and this action stems—at least in part—from such business activity. *See Miot v. Kechijian*, 830 F. Supp. 1460 (S.D.Fla.1993)(finding section 48.193(1)(a)(2) satisfied given defendants "initial solicitation of a Florida resident in a Florida forum [and] [f]ollowing this initial solicitation, the parties formed an ongoing business relationship with the Florida resident"); *Baker Electronics, Inc. v. Pentar Sys., Inc.*, 219 F. Supp. 2d 1260, 1264–65 (M.D. Fla. 2002) (finding section 48.193(1)(a)(2) satisfied where defendant "traveled to Florida to discuss" a business relationship with Plaintiff, "transmitted information to [Plaintiff] through electronic mail and facsimile," and "communicated with [Plaintiff] on numerous occasions to promote the future of the newly formed joint venture"). For these reasons, Defendants fall within the long arm statute.

### C. **Constitutional**

Because the long arm statute is satisfied, a constitutional analysis is not required, as the long arm statute is more stringent. *See Steller Group, Inc. v. Mid–Ohio Mech., Inc.*, 2004 WL 5685570, *2 (M.D. Fla. Jan. 28, 2004)("the requirements of Florida's long-arm statute are more stringent than those of the Constitution's Due Process Clause"). Even if that were not the case, the due process requirements are satisfied because both Defendants have availed themselves of Florida, including (a) having done business with XL's principals since approximately 2006 (see supra ¶3); (b) visited XL's principals in Miami multiple times (*see supra* ¶2); (c) solicited monies

12

from XL for their real estate projects, including Project Catalyst (*see supra* ¶¶16-17); (d) sending mailings to XL in Florida (*see supra* ¶¶7-8);; and (e) having received the $2,677,582.16 from XL's South Florida bank account. *See supra*, ¶10. Further, in a majority of the thirteen real estate transactions involving XL or its principals, a Florida entity was involved. In short, the Defendants knew full well that XL's principals and XL itself are based in Florida. The law is clear that, in this scenario (dealing with a Florida based company, Florida based principals, multiple communications to Florida and long term business arrangement with Florida based principals) the constitutional minimum contacts exist because defendants directed conduct to Florida and knew full well that it ran the risk of being hailed into court in Florida. *Miot*, 830 F. Supp. at 1464 ("A foreign defendant's direct solicitation of business from a forum resident has been held to be 'purposeful availment' in cases where either a continuing relationship or some in-forum performance on the part of the plaintiff was contemplated"); *Canadian Steel, Inc.*, 2012 WL 2326119, *5 ("defendant who allegedly committed an intentional tort targeting the Florida-based plaintiff had sufficient contacts with Florida for due process purposes").[11]

### D. **Defendants' Jurisdiction Arguments are Without Merit**

**MOCERI**: Moceri's jurisdiction arguments are that (a) the identified contacts are not "but for" causes of the claims and (b) his contacts in a corporate capacity are not individual contacts. For the reasons stated *supra*, both arguments fail.[12] Moreover, at points, Moceri argument appears

---

[11] *See also Air Prods. and Controls, Inc. v. Safetech Intern., Inc.*, 503 F.3d 544, 551–52 (6th Cir.2007) (numerous telephone calls, emails and facsimiles initiated by the non-resident defendant can demonstrate purposeful availment); *Rambo v. American Southern Ins. Co.*, 839 F.2d 1415, 1418 (10th Cir.1988) (telephone calls and letters may provide sufficient contacts to meet due process standards).

[12] Moceri relies heavily on *Waite* and asserts that Plaintiff's contacts with the forum cannot form the basis for jurisdiction. *Waite* is inapplicable because *Waite* involved an individual whom moved to a forum after suffering the injury in another forum. That is not the case here. Further,

to bleed into the merits of the claims (i.e., allegations not specific enough).  Beyond being unfounded (as addressed below), such merits arguments bleeding into jurisdictional argument is improper.  *See OSI Industries, Inc. v. Carter*, 834 So. 2d 362, 368 (Fla. 5 DCA 2003) ("the court applied an incorrect burden to [the plaintiff] in granting the motion to dismiss. The court's sole inquiry and determination should have been whether the tort as alleged occurred in Florida, and not whether the alleged tort actually occurred").[13]

**GRIGGS**: Defendant Griggs attempts to distance himself from Project Catalyst, claiming it was Moceri who made most of the communications to XL regarding Project Catalyst.  Griggs, however, conveniently omits from his affidavit that he is copied on almost every communication identified in the Complaint in support of XL's claims.  Griggs, notably, does not deny that he was involved in almost every (of the numerous calls) in which these misrepresentations were reinforced.  XL alleges that Griggs jurisdictional contacts (in which misrepresentations were made and reinforced) included calls with XL principals in Florida, stating:

> Griggs and Moceri further directed numerous telephone calls (and requests for conference calls) and communications to the Fischers in Florida in regards to Project Catalyst and other real estate projects with the Fischers. In fact, generally, the Fischers and Griggs/Moceri, were in contact multiple times monthly in regards to their joint real estate projects, including Project Catalyst.

---

Defendants logic does not make sense and, if followed to its conclusion, would mean that a defendant would not be subject to jurisdiction despite reaching into that forum because it was Plaintiffs decision to live/work in the forum.

[13] Notably, in his affidavit, Griggs did not deny many of the communications or multiple personal meetings in Florida.  As to one such meeting, he admits the Ballpark project was discussed and as to the other two meetings he simply states he did not recall discussing Ballpark.  This does not defeat the jurisdictional allegations.  *See OSI Industries, Inc.*, 834 So. 2d at 368 ("On the issue of whether the tort, as alleged, occurred in Florida, Carter's affidavits alleged that it did in the form of a telephone conversation. Lavin's affidavit did not deny the possibility that the telephone conversation occurred").

[D.E. #41, ¶21].  Griggs, in his affidavit, does not deny that he was on these numerous calls with

XL regarding Project Catalyst and this alone is sufficient contacts.  *See supra*, Sections II(b) and

(c).

### III.   ARBITRATION IS IMPROPER WHERE—AS HERE—NEITHER PLAINTIFF NOR DEFENDANTS ARE A PARTY TO THE ARBITRATION AGREEMENT

Defendants attempt to compel arbitration under an arbitration clause in an agreement to

which neither Plaintiff nor Defendants is a party is without merit.

**<u>NO VALID ARBITRATION AGREEMENT</u>**:  The law is clear that when neither

plaintiff nor defendants are a party to the agreement containing the relied upon arbitration clause,

arbitration cannot be compelled.  *See Kuroda v. SPJS Holdings, LLC*, C.A., 2010 WL 4880659,

*7 (Del. Ch. Nov. 30, 2010) ("I am aware of no case where this Court has required arbitration in

similar circumstances . . . [where] no parties to the litigation are parties to the [] Agreement").[14]

Realizing this dilemma, Defendants attempt to side step this issue by claiming XL admitted it was

a party to the agreement by virtue of statements of counsel at a hearing in this matter.  First, counsel

made no such representation and simply noted that XL is listed at the end of the agreement as XL

Catalyst's parent, but that does not mean it was a party to the agreement. To that end, Defendants'

counsel himself admitted at that same hearing that XL is not a party to the agreement.  [D.E. #42-

4, g. 12)]("The LLC agreement is between, it involves XL Catalyst LLC. It does not include XL

Funding, Inc. as a member").  Third, and most importantly since statements of counsel are not

evidence, a plain review of the agreement (as opposed to counsels' statements) reveals that XL is

---

[14] "Whether a nonparty to an arbitration agreement may enforce the agreement depends on the applicable state law regarding the enforceability of contracts." *Wiles v. Palm Springs Grill, LLC*, 2016 WL 4248315, *3 (S.D. Fla. Aug. 11, 2016).  The Operating Agreement contains a Delaware governing law provision.  [D.E. #42-9, pg. 33].  Regardless, Florida and Delaware law appear to be the same in regards to non-parties attempt to enforce arbitration agreements.

not a party.   [D.E. #42-9].   Given this, basic contract principles (i.e., when neither enforcer/enforcee is a party to the agreement, it is unenforceable) dictate that the motion to dismiss be denied.  See *Kuroda,* 2010 WL 4880659, *3 ("The presumption in favor of arbitration, however, "will not trump basic principles of contract interpretation, for a litigant 'cannot be required to submit to arbitration any dispute which [it] has not agreed to so submit.").[15]

Even if Plaintiff were a party to the agreement (which it is not), there is still no valid agreement because **<u>Defendants are not parties to the agreement</u>**.   Notwithstanding this, Defendants claim—relying on an equitable estoppel exception—that an agent of a party can enforce the agreement.  This contention is unfounded on these facts for several reasons.  First, the law on which Defendants rely establishes that the equitable estoppel exception only applies if the underlying action relies on the contract to impose liability on the defendant agents.  *See Koechli*, 870 So. 2d at 945 ("it would be inequitable to allow BIP both to rely upon the agreement in its action against non-signatories and selectively to repudiate it when seeking to resist arbitration").  That is not the case here for several reasons.  First, and unlike the cases Defendants rely upon (*Koechli* and *Giller*), XL is not even a party to the agreement and therefore does not seek to impose liability on defendants under the agreement.[16]  Second, XL alleges that Defendants were acting in their own interest, not as agents.

---

[15] Notably, Defendants—in making this assertion—seek to have it both ways.  When convenient for them, they believe corporate formalities should be recognized (i.e., they should not be subject to jurisdiction because they were working for Presidium), but when not convenient they contend otherwise  (i.e., XL should be deemed a party to the agreement even though it was its wholly owned subsidiary XL Catalyst that is the party to the agreement).

[16] The two paragraphs from the Complaint that Defendants cite in support of their assertion that XL seeks to impose liability under the agreement (¶¶24 and 79) do no such thing.  These paragraphs do not even mention the agreement and simply state that Defendants issued a capital call (which XL submits, in its claim, was improper because the capital call was contrary to the representations made to XL to obtain its investment).  Defendants may attempt to defend by relying

**NOT WITHIN SCOPE OF ARBITRATION CLAUSE**:  Even if there existed a valid arbitration agreement (which there does not), this matter does not fall within the scope of the arbitration clause.  As an initial matter and contrary to Defendants' assertions, the Court—not an arbitrator—must determine whether this matter is within the scope of arbitration clause even if the arbitration clause relegates that role to the arbitrator.  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1431 n.4 (2019) (Kagan, J., dissenting) ("Whatever state law might say, courts must find **'clear and unmistakable evidence'** before deciding that an agreement authorizes an arbitrator to decide a so-called 'question of arbitrability'")(emphasis added).  Courts have found that—when one litigant is not a party to the agreement (let alone when both litigants are not parties, as here)—the required clear and unmistakable requirement is not satisfied.  *See GNH Group, Inc. v. Guggenheim, LLC*, 2020 WL 4287358, *5 (D. Del. July 27, 2020)("the Court, guided by federal caselaw, cannot conclude that there is clear and unmistakable evidence that *these* parties (Plaintiff on the one hand, and the Non-Signatory Defendants on the other hand) agreed that an arbitrator should decide arbitrability with respect to Plaintiff's claims against them")(collecting cases).  As such, it is for this Court to determine whether this matter falls within the scope of the arbitration clause.  It does not for several reasons.

**First**, the clause is limited to the parties to the agreement of which neither Plaintiff nor Defendants are parties and thus this matter does not fall within the scope of the clause.  *See* [D.E.

---

on the agreement, but XL's claims are most definitively not based on the agreement.  Defendants also point to paragraph 61 of the Complaint to assert that they were only acting as agents.  XL is unclear how this would make its action founded on the agreement.  Regardless and as somewhat covered in the corporate shield section, the agency cloak does not shield agents for their intentional bad acts.  *See Fla. Specialty, Inc. v. H 2 Ology, Inc.*, 742 So.2d 523, 527 (Fla. 1st DCA 1999) ("[i]ndividual officers and agents of a corporation are personally liable where they have committed a tort even if such acts are performed within the scope of their employment or as corporate officers or agents").

#42-9, pg. 34] ("Any dispute, claim or controversy arising out of or relating to this Agreement which cannot be amicably resolved **among the parties**")(emphasis added); *see Beck Auto Sales, Inc. v. Asbury Jax Ford, LLC*, 249 So. 3d 765, 767 (Fla. 1ˢᵗ DCA 2018)("[defendant] was not a party to the arbitration agreement, so disputes with it fall outside of the agreement's general scope"); *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F. 3d 1351, 1356 (11th Cir. 2017) ("[plaintiff] never consented to arbitrate any disputes between it and the [individual defendants] or any other non-signatory. All it consented to arbitrate were disputes between it and the other party, which was [the corporations]").  **Second**, a majority of the acts underlying the RICO claim occurred well before the original agreement was executed on April 6, 2018.  The arbitration clause cannot be applied retroactively.  *See Carter v. Doll House II, Inc.*, 608 Fed.Appx. 903, 904 (11th Cir. 2015)("if the parties had intended retroactivity [as to the arbitration clause], they would have explicitly said so").  **Third**, the clause is limited to disputes "arising out of or relating to this agreement," which courts have held requires that the dispute involve performance of contractual duties.  *See Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir.2011) (holding that to fall within the "arising under the agreement" or "relating to the agreement" language requires "an immediate, foreseeable result of the **performance of contractual duties**" and that "If [defendant] had wanted a broader arbitration provision, it should have left the scope of it at 'any and all disputes, claims, or controversies whatsoever' instead of including the limitation that narrowed the scope to only those disputes, claims, or controversies 'relating to or in any way arising out of or connected with the . . . Agreement'").  This dispute does not involve performance or non-performance of contractual duties and for this additional reason does not fall within the scope of the arbitration provision.  For these reasons, this dispute does not fall within the arbitration clause.

18

## IV.   THE MOTION TO DISMISS FOR LACK OF SPECIFICITY AND LACK OF CONTINUITY FAILS.

**SPECIFICITY: "**Rule 9(b) must be read in conjunction with Rule 8, Fed.R.Civ.P., and thus, must not abrogate the concept of notice pleading.**"** *Colonial Penn Ins. Co. v. Value Rent-A-Car*, 814 F. Supp. 1084, 1092 (S.D. Fla. 1992).   "[F]raud-based offenses are pleaded with sufficient particularity where the complaint set forth 'the nature of the alleged misrepresentations and while it does not describe the precise words used, each allegation of fraud adequately describes the nature and subject of the alleged misrepresentation.'"   *See id.*   XL not only meets but exceeds its burden.   XL provides the exact dates of correspondence containing misrepresentations, the nature of the misrepresentation and who made the misrepresentation.   *See, e.g.,* [D.E. #41, ¶¶30-32, 34-45, 57—69, 75-79, 81-82, 85-87 and 88-91].   Given the large period of time (over four years) and sheer number of communications (over 12,000 pages of correspondence and countless calls), it was impossible to list every misrepresentation, but the Defendants know exactly what they are accused of doing and thus have enough information to prepare a responsive pleading.   *See id.* (rejecting argument that complaint is deficient if plaintiff does not "describe the date, place or time of the phone calls and letters that Defendants allegedly used in furtherance of their fraudulent scheme"); *Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F. Supp. 1260, 1265 (S.D. Fla. 1995)("Rule 9(b) only requires fair notice of the nature of plaintiffs' [ ] claims and the grounds upon which they are based so that defendants have adequate information to frame a response").   In regards to Defendants assertion that XL has not stated how it was misled or how their action was fraudulent, this is just not accurate.   XL specifically states (a) it was told and believed that the project would remain as profitable student housing and it would continue to generate the historical gains when Defendants' plan all along was to cut off this cash flow in favor of redevelopment and ask XL to pay for that redevelopment by virtue of capital calls; and (b) there were

19

misrepresentations that XL would (upon achievement of certain entitlements) be permitted the opportunity to increase its equity in the project from 6% to 12% which did not occur. Defendants may disagree with the allegations or that they constitute crimes under the referenced statutes, but the fact is they have the information necessary to frame that disagreement.[17]

Defendants' improper lumping argument is also without merit. As to almost every communication identified, Moceri sent the correspondence and Griggs was copied and did nothing to correct the misrepresentations. *See Phillip Morris USA v. Naugle*, 103 So. 3d 944, 946-47 (Fla. 4th DCA 2012)("[f]raud can occur by omission, and one who undertakes to disclose material information has a duty to disclose that information fully"). As such, the identified misrepresentations were from both defendants. Moreover, XL alleges Defendants reiterated or reinforced these misrepresentations in numerous phone calls. Again, Defendants may disagree with the allegations, but they have enough information to respond to the allegation. Further, even if XL's allegations could be characterized as collectively pleading, "the collective pleading approach employed has not created confusion regarding the specific conduct attributable to each defendant, this practice does not require dismissal under Rule 9(b)." *United States ex rel. Bibby v. Wells Fargo Bank, N.A.*, 2012 WL 12540345, *5 (N.D. Ga. Nov. 19, 2012); *Acciard v. Whitney*, 2008 WL 5120898, *10 (M.D. Fla. Dec. 4, 2008) (denying motion to dismiss where allegations were grouped together for defendants with the same role and plaintiffs had not "su[ed] several defendants that had different parts in a scheme and asserted every allegation against all defendants

---

[17] Defendants—relying on *Arthur*—appear to assert that a RICO claim violates Rule 9 if—even though the criminal statute violated is identified—plaintiff fails to identify the specific subsection of the statute. *Arthur* identified this but did not base its dismissal on this ground. Even it had, this would have been a misapplication of Rule 9, which requires only that Defendants have enough information to frame their responsive pleading. Defendants, as noted, have more than sufficient information to frame their response.

generally").   In fact, Griggs was able to—in his affidavit—deny he made the representations attributed to him.

**PATTERN OF RACKTEETING ACTIVITY:** Defendants assert that XL cannot satisfy the pattern of racketeering requirement because XL cannot establish continuity (either open ended or closed ended) since XL only alleges a single scheme with a clear end point.  This argument fails.  As an initial matter, in addressing the continuity argument, the facts must "[v]iew[ed] . . . in the light most favorable to plaintiff."  *S.Y. v. Shivparvti, LLC*, 2021 WL 825048, *4 (M.D. Fla. March 4, 2021)(rejecting RICO dismissal argument at motion to dismiss stage).  XL has alleged more than a single scheme with a discrete end goal.  XL—to that end—has alleged other fraudulent activities relative to four other real estate projects and other entities.  *See* [D.E. #41, ¶¶80-91]. Further, Defendants have also alleged Defendants engaged in fraudulent financial reporting to banks.[18]  *See id.*  Such allegations clearly (especially when viewing the facts in the light most favorable to XL), at a minimum, create an issue of fact as to the existence of continuity.  *See AIM Recycling of Florida, LLC v. Metals USA, Inc.*, 2020 WL 209860, *18 (S.D. Fla. Jan. 13, 2020)(rejecting single scheme argument and holding—at the summary judgment stage—that "[t]hese facts, and the inferences derived therefrom, present legitimate questions of fact concerning the continuity element").[19]

---

[18] *See Lockheed Martin Corp.,* 314 F. Supp. at 1221 (finding that for assessing pattern on a motion to dismiss, the court can consider "evidence of the defendant's business practices with respect to not just the plaintiff, but others as well.").

[19] Viewing the facts in the light most favorable to Defendants, these allegations establish the requirements of open ended continuity: "either that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, or that the predicate acts or offenses are part of an ongoing entity's regular way of doing business."  *See Lockheed Martin Corp., Boeing Co.*, 314 F. Supp. 2d 1198, 1221 (M.D. Fla. 2004)(the regular way of doing business showing can "be made with reference to 'a traditional criminal enterprise or with respect to an ongoing legitimate business'").  Equally, even if open ended continuity did not exist, these

21

## V.    THE COURT SHOULD GRANT LEAVE TO AMEND IF IT DISMISSES ANY PARTIES OR CLAIMS

As XL has shown above, the Defendants' motion fails in its entirety, and no parties or claims should be dismissed. Should the Court disagree, however, it should grant XL leave to amend to cure any pleading deficiencies that may exist. "Generally, when a more carefully drafted complaint might state a claim, the plaintiff must be given a chance to amend before dismissal." *Hollis v. W. Acad. Charter, Inc.*, 782 F. App'x 951, 955 (11th Cir. 2019); *see also Rosen v. TRW, Inc.*, 979 F.2d 191, 194 (11th Cir. 1992) ("[A] grant of leave to amend is particularly appropriate following dismissal of a complaint for failure to state a claim.").

Dated: March 26, 2021.

Respectfully Submitted,

WALDMAN BARNETT, P.L.
3250 Mary Street, Suite 102
Coconut Grove, Florida 33133
Telephone No:  (305) 371-8809
Facsimile:  (305) 448-4155

By:   /s/ *Glen H. Waldman*
         Glen H. Waldman, Esq.
         Fla. Bar No. 618624
         Michael A. Sayre, Esq.
         Fla. Bar. No. 17607
         *Attorneys for Plaintiff*

---

allegations support closed ended continuity because the predicate acts extended from January 20, 2017 to present (D.E. #41, ¶30)—a period of over four years that satisfies the closed ended continuity requirement.  *See Walgreen Co. v. Premier Products of America, Inc.,* 2012 WL 527169, *4 (M.D. Fla. Feb. 17, 2012)(there existed closed ended continuity where "'scheme' lasted for one year and one month"); *Design Pallets, Inc. v. Gray Robinson, P.A.*, 515 F. Supp. 2d 1246 (M.D. Fla. 2007)(" Plaintiffs have alleged related predicates occurring over a period of three and a half years, which is a substantial time period. Therefore, Plaintiffs have sufficiently alleged a "pattern" under RICO); *Allstate Ins. Co. v. Palterovich,* 653 F. Supp. 2d 1306, 1319 (S.D. Fla. 2009)("Here, there is both "closed-ended continuity" and "open-ended continuity."").

{00367071.DOCX }

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 26, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all parties of record.

*/s/ Glen H. Waldman*
Glen H. Waldman, Esq.
